UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

DOLORES J. BACON, M.D.,

                Plaintiff,

- against -

COLUMBIA UNIVERSITY COLLEGE OF
PHYSICIANS AND SURGEONS and
NEW YORK-PRESBYTERIAN HOSPITAL,

                Defendants.

------------------------------------------------------------x

05 CV 7033

ECF CASE

05 Civ. _____ (___)

COMPLAINT

PLAINTIFF DEMANDS
A JURY TRIAL



        Plaintiff Dolores J. Bacon, M.D., ("Dr. Bacon" or "plaintiff"), through her attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complaining of defendants Columbia University College of Physicians and Surgeons ("Columbia" or the "University") and New York-Presbyterian Hospital ("Presbyterian" or the "Hospital"), alleges as follows:

### NATURE OF ACTION

    1.    This action is brought to remedy discrimination on the basis of race and for retaliation against plaintiff for opposing unlawful discrimination, in violation of the Civil Rights Act of 1866, 42 U.S.C. §1981 ("Section 1981"); Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. ("Title VI"); the New York State Human Rights Law, N.Y. Exec. Law §290 et seq. (the "Human Rights Law"); and the Administrative Code of the City of New York §8-101 et seq. (the "Administrative Code").

229860 v1

2. Plaintiff seeks injunctive and declaratory relief, compensatory and punitive damages and other appropriate legal and equitable relief pursuant to Section 1981, Title VI, the Human Rights Law and the Administrative Code.

## JURISDICTION AND VENUE

3. This Court has jurisdiction under 28 U.S.C. §1331. Pursuant to 28 U.S.C. §1367, this Court has supplemental jurisdiction over plaintiff's claims brought under the Human Rights Law and the Administrative Code.

4. As the unlawful employment practices complained of herein occurred within the Southern District of New York and defendants' main offices are located in the Southern District of New York, venue is proper in this Court pursuant to 28 U.S.C. §1391.

5. Pursuant to § 8-502(c) of the Administrative Code, prior to filing this Complaint with the Court, plaintiff served a copy of this Complaint on the City of New York Commission on Human Rights and the City of New York Corporation Counsel.

## PARTIES

6. Dr. Bacon, a black woman, is a licensed physician specializing in internal medicine. She held joint appointments as Associate Clinical Professor of Medicine at Columbia and Assistant Attending Physician in the Department of Medicine of the Hospital.

7. Columbia is an employer within the meaning of the Human Rights Law and the Administrative Code, and is a university that includes a medical school, with its principal place of business in New York, New York. At all relevant times, Columbia has received federal financial assistance.

8.  The Hospital is an employer within the meaning of the Human Rights Law and the Administrative Code, and is a teaching hospital, with its principal place of business in New York, New York. At all relevant times, the Hospital has received federal financial assistance.

9.  Columbia and the Hospital jointly form the Columbia University Medical Center ("Medical Center"). Columbia and the Hospital each contributed to plaintiff's compensation. Columbia and the Hospital have interrelated operations and common management. Defendants jointly supervised plaintiff and directed and controlled the terms and conditions of her employment.

## FACTUAL ALLEGATIONS

10. Dr. Bacon was employed by defendants from February 1994 until her employment was involuntarily terminated on June 30, 2005. Her first academic position with Columbia was Instructor. She was promoted to Assistant Clinical Professor of Medicine in March 1995, and to Associate Clinical Professor of Medicine in December 2004. Her initial position with Presbyterian was Assistant Physician. She was promoted to Assistant Attending Physician in March 1995.

11. The Medical Center operates an Ambulatory Care Network ("ACN") that includes approximately six outpatient clinics. Beginning in 1994 plaintiff practiced in one of the ACN clinics located in Upper Manhattan, known since 2004 as the New York Presbyterian Family Health Center ("the Clinic"). In addition to caring for Clinic patients, plaintiff was responsible for supervising the training of medical residents and interns, and monitoring the treatment they provided to Clinic patients.

12. In the course of her Clinic work, plaintiff reported to employees of the Hospital and Columbia. She followed medical and office procedures adopted and enforced by each of the defendants.

13. Columbia paid Dr. Bacon's salary. A substantial portion of her compensation was provided by the Hospital to Columbia for Dr. Bacon's work at the ACN.

14. Dr. Bacon was one of the creators and directors of the Daniel Noyes Brown Scholars in Primary Care program, a privately endowed program that selects two to six medical students from each class to do clinical work at an ACN site to foster continuity of patient care. Dr. Bacon received awards for the excellence of her teaching.

15. In June 2003 Columbia appointed plaintiff as one of five Assistant Advisory Deans for Student Affairs, reporting to Dr. Linda Lewis, Senior Associate Dean for Student Affairs. In this position, Dr. Bacon was responsible for advising a fifth of the students in each medical school class.

16. Despite her exemplary service, throughout Dr. Bacon's employment she experienced a pattern of discrimination because of her race, and experienced retaliation for her opposition to discrimination.

17. The discrimination began even before plaintiff's hire. When plaintiff interviewed for her positions with defendants, Dr. Steven Shea, Director, Division of General Internal Medicine and Dean for Clinical Affairs, asked her how a "girl from the ghetto" made it to Cornell. Dr. Shea also asked plaintiff if she graduated on time, saying that minority students usually could not.

18. Dr. Bacon was the only black faculty member and attending physician in the Department of Medicine at the Clinic and was one of only three black doctors out of

229860 v1

4

approximately 20 at the entire Clinic. Of the non-physician staff in the department, there was only one black employee. While other clinics in the ACN have a relatively higher percentage of doctors who are non-white, the Family Health Center, referred to within the ACN as the "jewel" of the system, was staffed predominantly with white doctors.

19. In 1994 Dr. Bacon told Dr. Elaine Fleck, who is white and one of the two Medical Directors at the Clinic, that Dr. Fleck had made culturally and racially insensitive remarks that offended and alienated Dr. Bacon and some of the Clinic staff. After that conversation, Dr. Bacon was subjected to a hostile environment at the Clinic; she was treated differently from white doctors and held to different standards. Dr. Daniel Hyman, the Director of ACN who is white, was aware of, and condoned, the harassment of Dr. Bacon. Some examples of such different treatment include: Dr. Fleck trying to block Dr. Bacon's application to bring a minority fellow to the Clinic; the failure to provide Dr. Bacon with the support and assistance provided to white doctors; efforts by some Clinic staff to discourage patients from being treated by Dr. Bacon and facilitating the switch to other doctors; and attempts by some Clinic staff to solicit patient complaints against Dr. Bacon, including telling one such patient in March 2004 that they were going to do whatever it took to get Dr. Bacon out of the Clinic.

20. After Dr. Bacon became Dean, Dr. Hyman told her that the Hospital was going to cut its contribution to her salary. Thereafter, Columbia and the Hospital disputed which institution would make up the difference. Dr. Hyman told Dr. Bacon to reduce her administrative duties and do more sessions at the Clinic to receive more Hospital funding. Dr. Bacon pointed out that Dr. Fleck had more administrative duties and was not having her funding cut. Dr. Hyman responded, "What Elaine does has meaning to me. What you do has no meaning to me at all."

21. When Dr. Bacon complained to Dr. Shea about the dispute over the funding shortfall, he told her that the way in which she was being treated was "institutional racism."

22. Dr. Bacon was invited by a colleague to be co-principal investigator on a large National Institutes of Health ("NIH") grant to develop solutions for racial and ethnic disparities in health care, including creation of a curriculum addressing how race affects the delivery of medical services. As part of this project, in November 2003 Dr. Bacon gave a lecture to medical students that included discussion of instances of racism toward patients occurring at Columbia and the Hospital. In the lecture, Dr. Bacon asked the students to examine instances of racism and whether the medical community was condoning them. Upon information and belief, Dr. Ron Drusin, Dean for Curricular Affairs at the Medical School, was disapproving of the subject of the lecture, said it was inflammatory, and in 2004 stated that he did not want Dr. Bacon to give this lecture again. With the knowledge of the health sciences Deans, Dr. Bacon continued to develop the curriculum as part of the NIH grant.

23. In January 2004, Dr. Gerald Ridge, Director of Medicine at the Medical Center's Allen Pavilion, informed Dr. Bacon that there was still a shortfall for her salary, and that her salary would be cut if she did not find resources within one week to cover it. Dr. Ridge said the only way he could justify not cutting her salary was if she increased her teaching load, which was already the highest of any doctor at any of the ACN clinical sites. When Dr. Bacon complained to Dr. Shea, he said that she had made decisions that hurt her, such as championing the cause of minority students, and that she had not made any friends with the Hospital administration. He said she needed to learn how to be a team player, instead of complaining.

24. At that time, Dr. Bacon was assisting a black medical student, one of her advisees, who was threatened with expulsion because of his academic performance. After Dr. Bacon worked with the student, his performance improved, but the Faculty Committee for that class voted to expel him. Dr. Bacon was the student's advocate in his appeal. The Committee barred Dr. Bacon and Dr. Hilda Hutcherson, Associate Dean for Diversity and Minority Affairs, and a black woman, from its final meeting, and again voted to expel the student. With Dr. Bacon continuing as his advocate, the student appealed to the Executive Committee of the Faculty Council, which reversed the expulsion decision on or about June 30, 2004. During the appeal, Dr. Bacon repeatedly protested that the student was treated more harshly than non-black students with academic difficulties. Dean Lewis on numerous occasions expressed her annoyance that the student had appealed. Since the initial vote to expel him, the student has maintained his academic standing.

25. In or about March 2004, Dr. Bacon complained to the Columbia ombudsperson about the harassment she was experiencing at the Clinic, including the attempts to solicit patient complaints against her. When, in response to the ombudsperson's question, Dr. Bacon said there were no other black doctors in her department at the Clinic, the ombudsperson suggested she go to the University's Office of Equal Opportunity and Affirmative Action ("EOAA office"). The EOAA office advised Dr. Bacon that she could sue for harassment and discrimination, or pursue a formal grievance or a mediation. Dr. Bacon chose to mediate her claims. The EEOA office notified Dr. Hyman of Dr. Bacon's mediation and her allegations of race discrimination and harassment. On or about June 23, 2005, the mediator notified Dr. Bacon that she was ending the mediation, without resolution of Dr. Bacon's claims.

26. When Dr. Bacon was promoted to Associate Clinical Professor as of December 1, 2004, contrary to usual practice, Columbia did not formally notify Dr. Bacon of the promotion, did not raise her base salary, and did not change her listing in the University directories to reflect her new title.

27. On or about May 20, 2005, Dr. David Brenner, Chair of the Department of Medicine, told Dr. Bacon that the Hospital was ending her salary line "for budget reasons" as of December 2005, but that he did not know anything else about it. Dr. Brenner said that he understood that Dr. Hyman had already spoken to Dr. Bacon about this. Dr. Bacon said that Dr. Hyman had told her nothing. Dr. Bacon asked if there were other positions available in the Department of Medicine that would provide the funding. Dr. Brenner referred Dr. Bacon to Dr. Shea and to Dr. Hyman for answers to her questions. Dr. Bacon was the only doctor in the Clinic whose employment was terminated.

28. For weeks thereafter, in conversations with Dr. Brenner, Dr. Shea and Dean Lewis, Dr. Bacon tried without success to obtain answers about her status. She was given conflicting information as to whether the Hospital funding would end in July or December 2005. She was provided conflicting information about whether or not the Hospital was claiming that its decision was based on her performance, although no one told Dr. Bacon how her performance was allegedly deficient. Whenever Dr. Bacon asked about other open clinical positions within the Medical Center, she was told to talk to someone else.

29. Dr. Bacon spoke with Dean Lewis on or about June 7, 2005, about her status. Dean Lewis told Dr. Bacon that she was like the "Peanuts" character "Pigpen," "with a cloud of dirt around [her] everywhere [she] go[es]."

30. Upon information and belief, when other doctors have lost their positions, the University has assisted them with finding another position. Although Columbia and the Hospital did not find or offer another position to Dr. Bacon, non-black physicians who were fired by the Hospital were offered other positions or did not have their faculty appointments terminated, as was done, for example, for a neurologist at the Clinic, the previous head of the ACN, and the Chief of Medicine at the Medical Center's Allen Pavilion.

31. On June 8, 2005, Dr. Brenner told Dr. Bacon that she "no longer had a job." In a following letter post-marked June 15, 2005, but dated June 1, 2005, he notified her that her academic appointment would not be renewed beyond December 31, 2005. On June 21, Dean Lewis notified Dr. Bacon that she would no longer be an Assistant Dean for the coming academic year, effective July 1, because she would not be a Columbia employee as of July 1, 2005.

32. When a white dean left his position, he was permitted to work through a transition period with his replacement, and Dean Lewis issued a memorandum about his contributions and the transition period. In contrast, on June 27, 2005, without consulting Dr. Bacon, Dr. Lewis sent out a mass e-mail announcing that another doctor had succeeded Dr. Bacon as Assistant Dean. Dr. Lewis did not send Dr. Bacon a copy of the e-mail until Dr. Bacon learned of it from students and asked for a copy.

33. Dr. Bacon's counsel wrote to defendants' counsel on June 27, 2005 seeking to clarify her clinical and academic status and duties. Columbia responded on July 14, 2005 that it was continuing Dr. Bacon's salary through December 31, 2005, although she would not be performing her faculty or administrative duties, and that it did not know what the Hospital's

expectations were for Dr. Bacon after July 1. By letter dated July 20, 2005, the Hospital, through counsel, falsely accused Dr. Bacon of abandoning her duties without notice.

34. Because of the way the termination of Dr. Bacon's employment was handled, with a lack of information and conflicting statements about the reasons and effective dates, it has fostered rumors within the University and Hospital that Dr. Bacon was fired for poor performance.

35. Defendants created and maintain a hostile work environment and decided to terminate plaintiff's employment because of her race. Defendants also retaliated against plaintiff for her opposition to unlawful discrimination, including asserting her own right to be free from discrimination, as well as the rights of students and patients to be free from race discrimination in the making and enforcement of contracts and in their participation in programs offered by institutions receiving federal funding.

36. In addition to the loss of income, plaintiff has suffered humiliation, damage to her reputation and emotional distress as a result of the hostile work environment and defendants' decision to terminate her employment.

## FIRST CLAIM FOR RELIEF
## SECTION 1981 (RACE DISCRIMINATION)

37. Plaintiff repeats and realleges paragraphs 1 through 36 as if fully set forth herein.

38. Defendants have violated Section 1981 by depriving plaintiff of her equal rights under the law by subjecting plaintiff to a hostile work environment and by terminating plaintiff's employment on account of her race. Defendants' actions deprived plaintiff of the equal right to make and enforce contracts, including her right to the enjoyment of the benefits, privileges, terms, and conditions of her contractual relationship with defendants.

39. Defendants knew that their actions constituted unlawful discrimination on the basis of race and/or showed reckless disregard for plaintiff's statutorily protected rights.

40. Plaintiff is now suffering irreparable injury and monetary damages as a result of defendants' discriminatory conduct, and will continue to do so unless and until the Court grants relief.

## SECOND CLAIM FOR RELIEF
## SECTION 1981 (RETALIATION)

41. Plaintiff repeats and realleges paragraphs 1 through 40 as if fully set forth herein.

42. Defendants have violated Section 1981 by depriving plaintiff of her equal rights under the law by retaliating against her for opposing unlawful race discrimination. Defendants' actions deprived plaintiff of the equal right to make and enforce contracts, including her right to the enjoyment of the benefits, privileges, terms, and conditions of her contractual relationship with defendants.

43. Defendants knew that their actions constituted unlawful retaliation and/or showed reckless disregard for plaintiff's statutorily protected rights.

44. Plaintiff is now suffering irreparable injury and monetary damages as a result of defendants' retaliatory conduct, and will continue to do so unless and until the Court grants relief.

## THIRD CLAIM FOR RELIEF
## TITLE VI (RACE DISCRIMINATION)

45. Plaintiff repeats and realleges paragraphs 1 through 44 as if fully set forth herein.

229860 v1

11

46. Defendants have violated Title VI by depriving plaintiff of her equal rights under the law by subjecting plaintiff to a hostile work environment and by terminating plaintiff's employment on account of her race.

47. Defendants knew that their actions constituted unlawful discrimination on the basis of race and/or showed reckless disregard for plaintiff's statutorily protected rights.

48. Plaintiff is now suffering irreparable injury and monetary damages as a result of defendants' discriminatory conduct, and will continue to do so unless and until the Court grants relief.

## FOURTH CLAIM FOR RELIEF
## TITLE VI (RETALIATION)

49. Plaintiff repeats and realleges paragraphs 1 through 48 as if fully set forth herein.

50. Defendants have violated Title VI by depriving plaintiff of her equal rights under the law by retaliating against her for opposing unlawful race discrimination.

51. Defendants knew that their actions constituted unlawful retaliation and/or showed reckless disregard for plaintiff's statutorily protected rights.

52. Plaintiff is now suffering irreparable injury and monetary damages as a result of defendants' retaliatory conduct, and will continue to do so unless and until the Court grants relief.

## FIFTH CLAIM FOR RELIEF
## HUMAN RIGHTS LAW (RACE DISCRIMINATION)

53. Plaintiff repeats and realleges paragraphs 1 through 52 as if fully set forth herein.

54. By the acts and practices described above, defendants have discriminated against plaintiff because of her race in violation of the Human Rights Law.

55. Plaintiff is now suffering irreparable injury and monetary damages as a result of defendants' discriminatory conduct, and will continue to do so unless and until the Court grants relief.

### SIXTH CLAIM FOR RELIEF
### HUMAN RIGHTS LAW (RETALIATION)

56. Plaintiff repeats and realleges paragraphs 1 through 55 as if fully set forth herein.

57. By the acts and practices described above, defendants have retaliated against plaintiff for opposing unlawful discrimination, in violation of the Human Rights Law.

58. Plaintiff is now suffering irreparable injury and monetary damages as a result of defendants' retaliatory conduct, and will continue to do so unless and until the Court grants relief.

### SEVENTH CLAIM FOR RELIEF
### ADMINISTRATIVE CODE (RACE DISCRIMINATION)

59. Plaintiff repeats and realleges paragraphs 1 through 58 as if fully set forth herein.

60. By the acts and practices described above, defendants have discriminated against plaintiff because of her race, in violation of the Administrative Code.

61. Defendants knew that their actions constituted unlawful discrimination on the basis of plaintiff's race, and/or showed reckless disregard for plaintiff's statutorily protected rights.

62. Plaintiff is now suffering irreparable injury and monetary damages as a result of defendants' discriminatory conduct, and will continue to do so unless and until the Court grants relief.

## EIGHTH CLAIM FOR RELIEF
## ADMINISTRATIVE CODE (RETALIATION)

63. Plaintiff repeats and realleges paragraphs 1 through 62 as if fully set forth herein.

64. By the acts and practices described above, defendants have retaliated against plaintiff for opposing unlawful discrimination, in violation of the Administrative Code.

65. Defendants knew that their actions constituted unlawful retaliation, and/or showed reckless disregard for plaintiff's statutorily protected rights.

66. Plaintiff is now suffering irreparable injury and monetary damages as a result of defendants' retaliatory conduct, and will continue to do so unless and until the Court grants relief.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

a. declaring the acts and practices complained of herein are in violation of Section 1981, Title VI, the Human Rights Law and the Administrative Code;

b. enjoining and permanently restraining these violations of Section 1981, Title VI, the Human Rights Law and the Administrative Code;

c. directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment opportunities, including reinstating her;

d. directing defendants to pay plaintiff any wages, salary, bonuses, raises, benefits, or other forms of compensation, and interest thereon, she has been denied as a result of defendants' discriminatory and retaliatory conduct.

    e.  directing defendants to pay plaintiff an additional amount as compensatory damages for her emotional distress, humiliation, pain and suffering, and interest thereon;

    f.  directing defendants to pay plaintiff an additional amount as punitive damages for their willful and/or reckless disregard for her statutory rights, and interest thereon;

    g.  awarding plaintiff her reasonable attorneys' fees and costs;

    h.  awarding plaintiff damages to compensate for any adverse tax consequences of any award; and

    i.  granting such other and further relief as this Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs demand a trial by jury.

Dated: New York, New York
   August 8, 2005

                VLADECK, WALDMAN, ELIAS &
                ENGELHARD, P.C.

         By: *[signature]*
            Judith P. Vladeck (JV 2908)
            Anne L. Clark (AC 6456)
            Attorneys for Plaintiff
            1501 Broadway, Suite 800
            New York, New York 10036
            (212) 403-7300